1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3     _____

4     YOUNG AMERICANS FOR LIBERTY AT
      KELLOGG COMMUNITY COLLEGE,
5     et al.,

6                         Plaintiffs,
                                          DOCKET NO. 1:17-cv-58
7     vs.

8

      KELLOGG COMMUNITY COLLEGE,
9     et al.,

10                        Defendants.

11    _____/

12

13      TRANSCRIPT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

14            BEFORE THE HONORABLE ROBERT J. JONKER

15              UNITED STATES DISTRICT JUDGE

16              GRAND RAPIDS, MICHIGAN

17                   August 1, 2017

18

19    Court Reporter:          Glenda Trexler
                               Official Court Reporter
20                             United States District Court
                               685 Federal Building
21                             110 Michigan Street, N.W.
                               Grand Rapids, Michigan 49503
22

23    Proceedings reported by stenotype, transcript produced by

24    computer-aided transcription.

25

```
 1    A P P E A R A N C E S:

 2    FOR THE PLAINTIFFS:

 3         MR. TRAVIS CHRISTOPHER BARHAM
           ALLIANCE DEFENDING FREEDOM
 4         1000 Hurricane Shoals Road, N.W., Suite D-1100
           Lawrenceville, Georgia 30043
 5         Phone:  (770) 339-0774
           Email: tbarham@ADFlegal.org

 6
           MR. M. CASEY MATTOX
 7         ALLIANCE DEFENDING FREEDOM
           440 First Street, N.W. Suite 600
 8         Washington, DC 20001
           Phone:  (202) 393-8690
 9         Email: cmattox@ADFlegal.org

10         MR. JESHUA THOMAS LAUKA
           DAVID & WIERENGA, PC
11         99 Monroe Avenue, N.W., Suite 1210
           Grand Rapids, Michigan 49503
12         Phone:  (616) 454-3883
           Email: jeshua@dwlawpc.com

13
      FOR THE DEFENDANTS:
14
           MS. MEGAN P. NORRIS
15         MILLER, CANFIELD, PADDOCK & STONE, PLC
           150 West Jefferson Avenue, Suite 2500
16         Detroit, Michigan 48226-4415
           Phone:  (313) 963-6420
17         Email:  Norris@millercanfield.com

18                        *   *   *   *   *

19                                Grand Rapids, Michigan

20                                August 1, 2017

21                                3:32 p.m.

22                   P R O C E E D I N G S

23         THE COURT:  All right.  We're here on the case of the

24    Young Americans for Liberty against Kellogg Community College.

25    It's 1:17-cv-58.  A hearing on the plaintiffs' motion for
```

1   preliminary injunction.

2           Let's start with appearances and go from there.

3           MR. BARHAM:  Your Honor, my name is Travis Barham.  I

4   represent plaintiffs.  With me today is Casey Mattox and

5   Jeshua Lauka.

6           THE COURT:  Okay.  Thank you.

7           MS. NORRIS:  Megan Norris on behalf of defendants.

8           THE COURT:  Okay.  So we obviously have had your

9   materials now on file for a while, and both sides have

10  submitted some declarations or affidavits.  So I think we have

11  a record on which we can proceed today.  If it becomes clear

12  that we need actual testimony to resolve critical factual

13  disputes, I think that will probably come up in the course of

14  the argument.

15          What I really want to start with, amongst the

16  plaintiffs' motion, is just to get a few things from the

17  defendants' perspective, and then we can go to a more normal

18  argument.

19          But I'm surprised in a way that Kellogg Community

20  College wants to defend the current policy on its own written

21  terms.  I mean, the brief, at least as I read it, tries to

22  defend some of it but also seems to slide by some of the actual

23  text of the policy and say, "Well, we don't really do it that

24  way."  And it would seem like, to me anyway, to say "Well, on

25  the one hand our policy says we're content-neutral, can't take

1    content into account, but on the other hand, in order to get

2    the permit you need to be consistent with the mission of the

3    university or student group."  It's almost in dissidence.  I

4    don't see how you can have no consideration of content if

5    consistency with mission is one of the requirements.

6         More generally, how a policy that flat-out prohibits

7    solicitation without prior permit, when solicitation is so

8    broad as to include pretty much anything students might want to

9    talk about amongst each other, it strikes me that, you know,

10   it's got that 1984 aura.  You know, it's okay to speak, but

11   only if the government gives you permission first.

12        And it may be that the parties are divided on much

13   more fundamental things than that, but I guess at the outset,

14   what is so important to the defendant about this policy as

15   opposed to some of the others we've seen?  The Grand Valley

16   policy, for example, most recently changed.  That still, of

17   course, recognizes the defendant's need and right to manage

18   groups in a way that doesn't put anybody in jeopardy

19   physically, safety, all that matters.  But, seriously, I mean,

20   do you need this policy to do it?  What about this policy do

21   you see as so important that you don't want to modify it in any

22   way?  So let me start out with that, and then we'll go to more

23   conventional orders.

24        *MS. NORRIS:*  Sure.  Certainly, Your Honor.  So, first

25   of all, I believe I said publicly in this court the last time I

1    was here in April, and certainly said repeatedly at the

2    settlement conference that you directed us to with our request,

3    the college has never said it refuses to change anything about

4    the policy.  We had an extensive settlement conference.  We had

5    extensive discussions with the magistrate about --

6              THE COURT:  Right.  But I guess -- and I don't need

7    to know all the details of your settlement.  But I guess today

8    the question is:  Do I enjoin your policy as written?  That's

9    what you're talking about.  So as a practical matter today you

10   have to defend that policy.

11             MS. NORRIS:  So I don't have any problem defending

12   the policy.  I think the question of whether we're willing to

13   make any changes to the policy is an entirely different

14   question from whether it's a legal policy.

15             THE COURT:  Let me ask you questions.  How do you

16   defend the idea that it's content-neutral when consistency with

17   mission is one of the things that you have to find?  How can

18   you do that without considering content?

19             MS. NORRIS:  Well, as discussed in many of the

20   cases --

21             THE COURT:  Well, how do you do that here?  I mean,

22   the cases go both ways.  I mean, I don't see anything that's so

23   specifically good for you in the case law that -- don't you

24   just as a practical matter have to consider mission -- or

25   content if mission consistency is the touchstone?

1          *MS. NORRIS:*  No, I don't think that you do.

2          *THE COURT:*  How can you do that?  How do you know if

3     it's consistent with the mission if you don't consider content?

4          *MS. NORRIS:*  So, for example, if you have a condensed

5     campus, as Kellogg Community College does, where most of the

6     student traffic is in a fairly condensed area, and you say our

7     primary mission is to get students to classes, get students

8     educated, get students to the offices where they want to get,

9     you can say we don't want to congest up those areas with group

10    activities.

11         *THE COURT:*  Well, that's different.  I mean,

12    that's -- that's discussing the volume of people, or you can

13    prohibit people from blocking sidewalks or doorways.  But if

14    you're saying in your policy -- and it seems to say it -- that

15    to get the permit you have to be consistent with the college's

16    mission or the mission of a recognized student group, how do

17    you judge that without looking at the content of what the

18    speaker wants to say?

19         *MS. NORRIS:*  I think I've just given you one example.

20    I don't think that it matters at all whether it's

21    American Express coming in to solicit for credit cards --

22         *THE COURT:*  All right.  But, I mean, if that's your

23    argument, you're going to lose on that, because --

24         *MS. NORRIS:*  I hear you --

25         *THE COURT:*  -- because there's no way that I can read

1    that policy fairly and say, "Well, what mission consistency

2    means is crowd control."  I mean, give me a break.  There's all

3    kinds of ways to manage crowd control that don't require you to

4    say a speaker has to be consistent with the mission of the

5    university.

6         MS. NORRIS:  With all due respect, Your Honor, I

7    agree with you the cases go both ways, and I'm prepared to

8    address the cases when you want me to do that.  But many of the

9    cases, many of the cases involve a policy that has exactly the

10   mission language we have, and the reason is that if you're --

11        THE COURT:  Well, I'm talking about outside --

12   there's differences as well between outside groups that come

13   and students who want to speak.  Or students who want to

14   connect up with an organization that wants to speak.  And

15   at least in this case you have existing students who are

16   interested in this particular speech.  So, I mean, I think

17   you're in the weakest possible position when you're talking

18   about requiring your students to come forward and restrict

19   mission.  A lot of the cases that are on their surface more

20   supportive of you are simply applied to outside groups that

21   don't have any connection to the school through students.

22        MS. NORRIS:  There certainly is a different standard

23   for students versus outside groups, I agree with the Court on

24   that issue.  But if an entity is going to declare itself

25   something other than a traditional public forum like a sidewalk

1    where anybody can walk up and down the street or sit in the

2    park or wherever, one of the things it has to do, and the cases

3    regarding universities specifically talk about, is it has to

4    say we're only going to be a forum for things that are

5    consistent with our mission.  And so that statement is not a

6    throw-away or a mistaken statement.  But that is not to say

7    that the content or the position taken by the speaker is a

8    factor that is considered.

9         *THE COURT:*  I just don't see logically how you can

10   possibly judge mission consistency without knowing what the

11   speaker -- without looking at the content of the speech.

12   Maybe, as you suggest, you never decline it because of a

13   speaker content, but on the face of the policy, how do you -- I

14   just don't understand logically how that can be.

15        *MS. NORRIS:*  This particular group was specifically

16   told that on that day in question they could have permission to

17   solicit.  They chose not to go through the process.  But to --

18   otherwise to have otherwise --

19        *THE COURT:*  That gets to the second point, I guess,

20   which is how can you really defend a policy that says you can't

21   have any solicitation without prior permission?  Why isn't that

22   just the Orwellian 1984?  You know, two students start talking

23   about Rand Paul and they want to get other students to see

24   their vision.  Technically that falls within your solicitation

25   policy.  You can say, "Well, it really doesn't," but at least

1    the language of the policy covers that.  So you'd have no

2    spontaneous communication at all.  And I just find that

3    astonishing.

4         MS. NORRIS:  As I've indicated, Your Honor, these

5    policies have been upheld going back to the Supreme Court

6    case --

7         THE COURT:  Well, tell me -- unless you can tell me

8    there's something that compels me to -- you know, like a

9    controlling authority, don't talk too much about other cases

10   right now.  How do you defend that?  I mean, do you really want

11   to be in the paper saying "Yeah, we arrest people who pass out

12   Constitutions on our campus without our prior permission"?  I

13   mean, that's your optics.  That's a terrible optical position

14   for you to be in, isn't it?

15        MS. NORRIS:  I agree that that's bad publicity for

16   the college.  Absolutely.  But that isn't the story.

17        THE COURT:  Well, I mean, it's certainly the story

18   the plaintiff tells in their sworn affidavit.

19        MS. NORRIS:  It is certainly the story --

20        THE COURT:  And what's wrong with that story?  They

21   were passing out Constitutions without your prior permission

22   and they got arrested for it.

23        MS. NORRIS:  They were not just passing out

24   Constitutions, they were soliciting students, and the college

25   received a complaint from a student about being solicited.

1          *THE COURT:*  All right.  I think you've got real

2     problems trying to defend the policy as written on these facts.

3     And I don't understand why you want to.  That's really what I

4     wanted to hear at first.  You know, because it just seems to me

5     you invite needless bad publicity.

6          You certainly have, as any school does, the right to

7     prevent people from blocking the doors and all that sort of

8     thing, but that's not the way your policy reads to me.

9     At least on paper.

10          But why don't we hear from the plaintiffs, spend

11     about 15 minutes summarizing yours.  We'll hear from Ms. Norris

12     for her formal argument in response.  And any rebuttal that the

13     plaintiff has.  If each side overall takes about 20 or 25

14     minutes, I think we can get the focal point of what each side's

15     positions are and then go from there.  Thank you.

16          *MR. BARHAM:*  Good afternoon, Your Honor.  May it

17     please the Court.  As you mentioned, we're here today on

18     plaintiffs' motion for preliminary injunction seeking to enjoin

19     defendants' speech permit and speech zone policies that require

20     students to get a permit to engage in any expressive

21     activities.  And these policies prohibit students from engaging

22     in those activities anywhere outdoors.  In enforcing those

23     policies, defendants threatened to arrest Mr. Withers and

24     arrested Mrs. Gregoire because they stood on a sidewalk,

25     engaged students in conversation, collected signatures, and

1    handed out copies of the Constitution.

2            In 2012 the University of Cincinnati did something

3    very similar to another chapter of Young Americans for Liberty,

4    and when those students also sought to collect signatures the

5    university restricted those students to one corner of one quad

6    on campus, required them to get a permit, and threatened to

7    arrest them if they went anywhere else to exercise their

8    First Amendment rights.

9            In 2012 the Southern District of Ohio issued a

10   preliminary injunction prohibiting the university from

11   requiring students to give that prior notice, prohibiting them

12   from requiring students to limit their activities to certain

13   areas of campus, and prohibiting them from imposing any policy

14   restricting student speech in the outdoor generally accessible

15   areas of campus unless they could prove it would pass strict

16   scrutiny.

17           This case involves similar policies and more

18   egregious facts and, therefore, plaintiffs respectfully request

19   that this Court do likewise.  After all, in a couple of weeks

20   students, including Mrs. Gregoire, will return to campus.  The

21   policies that led to her arrest remain in effect, curtailing

22   her ability to recruit students and banning student speech

23   outdoors.

24           Even after being sued, even after being directed to

25   policies that would correct the constitutional flaws here, even

1    after we provided them a model policy, and even after a

2    settlement conference defendants have refused to change these

3    policies and, therefore, an injunction is necessary.

4              Your Honor, as you have noted, these policies are

5    inherently content- and viewpoint-based because they require

6    school officials to assess whether or not speech is consistent

7    with the mission and purpose of KCC.  And one can just look at

8    the mission and purpose statement to see just how much leeway

9    there is for viewpoint discrimination.  After all defendants

10   can stop students from speaking if they decide that student

11   speech does not enrich our community for the lives of

12   individual learners.  They can ban speech if they decide it

13   does not lead to enhanced employability, if it does not help

14   students think critically, if it does not demonstrate global

15   awareness, if it does not promote, support, and enhance student

16   success.  All of these are inherently content- and

17   viewpoint-based assessments that require university officials

18   or college officials to look at the content of what students

19   are saying to determine whether or not it can be allowed on

20   campus.

21             And, therefore, the empty words that are included in

22   the policy that the college does not take in considering

23   content are just that, empty words.  And we have evidence here

24   of how defendants enforce this policy in a content-based way.

25   They sat there and watched our client speak.  They watched them

1    ask questions of students.  Questions like "Do you like freedom

2    and liberty?"  And they decided that those questions were

3    provocative, and because those questions were provocative they

4    could not be allowed on an open sidewalk on campus.

5            And even just now opposing counsel mentions that this

6    is content-based enforcement because she mentioned that the

7    college acted because it received a complaint from students.

8    Well, the Supreme Court ruled in 1992 that listeners' reaction

9    to speech is not a content-neutral basis for regulation.

10           And Defendant Hutchinson said that he was acting to

11   protect certain students from hearing things that he didn't

12   think they had -- that they felt like they could just walk

13   past.  Well, the Constitution does not empower government

14   officials to protect people from certain types of speech.  The

15   essence of free speech is that those messages should be allowed

16   to be promulgated on campus.  So there's no way to avoid the

17   fact that this is a content- and viewpoint-based policy.  And,

18   frankly, that alone is sufficient reason for this Court to

19   strike down the policy and to issue the requested injunction.

20           And as this Court noted, the policy is an incredibly

21   broad prior restraint.  You cannot engage in any expression on

22   campus without getting prior permission.  That is repeated

23   at least two or three times in the policy.  On page ID 100,

24   page ID 105, page ID 126 all say that you have to get prior

25   permission in order to solicit on campus.  And the definition

1    of solicitation involves a broad swath of protected classic

2    forms of protected speech.  So it's hard to imagine how

3    defendants could have written this policy to be any more broad.

4    There's definite overbreadth problems with this policy.

5         Opposing counsel mentions their concern about crowd

6    control and congestion.  Well, the Williams court dealt with

7    very similar arguments, and it noted that there was nothing

8    preventing the college from imposing policies that address that

9    congestion and traffic concern.  If a policy is going to be

10   narrowly tailored to address traffic, then it needs to target

11   and eliminate no more than the exact source of the evil it

12   seeks to remedy.  But the problem with the policies here is

13   that they burden far more speech.  Two people standing on a

14   sidewalk discussing Senator Paul do not block access to

15   classes.  Two people standing on a sidewalk discussing

16   Senator Paul don't block entrances and exits to buildings.  Two

17   people standing on a campus handing out copies of the

18   Constitution do not seriously block access to education.

19   There's no way that one can seriously maintain that that's the

20   case.

21        So all of that is -- it's almost -- it's almost

22   hyperbolic, but it's the same kind of argument that the

23   University of Cincinnati set forward and that did not pass

24   muster there.  It's the same sort of argument that the

25   university in Roberts versus Haragan set forth, and it didn't

1    pass muster there.  So it shouldn't pass muster here either.

2              The policy is overbroad.  The policy restricts

3    student speech all over campus, all over places that are

4    unquestionably designated public forums for student speech.

5              And none of the cases that defendants cite in their

6    brief, none of the cases that they allude to here change the

7    fact that a university campus is a designated public forum for

8    student speech.  Every court that has addressed a speech zone

9    case dealing with student speech -- not outsider speech but

10   student speech -- has held that these areas are designated

11   public forum.

12             In fact, the Williams court makes this very clear,

13   and it addresses one of the cases that opposing counsel cites

14   in her brief.  The Gilles case.  It says "Gilles does not

15   suggest nor is this court aware of any other precedent

16   establishing that a public university may constitutionally

17   designate its entire campus as a limited public forum."

18             So when opposing counsel says that they have to have

19   this mission and purpose requirement in order to change the

20   status of their campus, it's a futile effort.  There is no

21   federal court allowing a university to designate its entire

22   campus as a limited public forum.  Indeed, the Williams court

23   says to declare the entire campus a limited public forum and to

24   say that it's subject only to reasonableness and viewpoint

25   neutrality, it would be anathema to the purpose of the

1    university, and so it shouldn't be allowed here either.

2           So the areas that our clients were trying to speak,

3    like I said, open, outdoor, generally accessible areas, the

4    areas that anybody can access at any time, those are limited --

5    those are designated public forums for students.  Any

6    restriction there has to be narrow, it has to be

7    content-neutral, and this policy is not.  It has to be narrowly

8    tailored to a significant governmental interest, which this

9    policy is not.  And it has to allow ample alternative means of

10   communication, and this policy allows none.  In fact, opposing

11   counsel's suggestion:  Where can students speak without a

12   permit?  Go off campus.  That's not an ample alternative means

13   of communication when your intended audience is fellow

14   students.

15          So with -- and then the problems are highlighted by

16   the way that opposing -- that defendants enforce these

17   policies.  Making it clear that none of them really had a clear

18   idea as to what was required, where they could speak, when they

19   could speak, what they had to do in order to speak.  So when

20   university officials do not even understand what the policies

21   are, then the Williams court says that the policy is vague on

22   its face and must be enjoined.

23          None of the other interests that they have

24   highlighted, whether it be traffic, whether it be litter,

25   whether it be anything else, are narrowly tailored to this --

1    these policies are not narrowly tailored to that.  They don't

2    need to ban student speech in all of campus unless you get a

3    permit in order to prevent -- in order to make sure that

4    students can get to classes.  They already have -- in fact,

5    they already have other policies that enable them to address

6    these issues.

7              For example, the student code of conduct already

8    prohibits intimidation.  It already prohibits disruptive

9    activities.  It already prohibits endangerment.  It already

10   prohibits harassment.  Those are all the things that they were

11   just talking about.  So they can achieve all of their

12   legitimate interests in maintaining safety, in maintaining

13   traffic flow on campus, and making sure that students can get

14   to class on time without saying that students can only speak

15   outdoors if they first get permission from school officials.

16   Permission that, of course, can be denied for any reason

17   whatsoever, because there is no guarantee in this policy that

18   any request for a permit will be granted.  You can satisfy all

19   of the written criteria, you can even be consistent with KCC's

20   mission and there's no guarantee that your request will be

21   granted.  Which is another reason that this policy is

22   viewpoint- and content-based because it grants that unbridled

23   discretion.

24             With that, Your Honor, I'll reserve the balance of my

25   time.

1          *THE COURT:*  All right.  We'll go to Ms. Norris.

2   Thank you.

3          *MS. NORRIS:*  Your Honor, I've been in this court many

4   times and I have a great deal of respect for your preparation.

5   My first experience here was your very first Rule 16 conference

6   in which you pointed out what you thought was a typo in a

7   paragraph of my Answer, and I had to confess that I've never

8   had a judge actually read my Answer before.  So it turned out

9   it wasn't a typo, I was right, and I was really pleased to tell

10  you that, but the fact that you had gotten that deeply into the

11  weeds was nonetheless impressive.  So you've made it clear to

12  me I have an uphill battle, but I would like to -- I feel

13  strongly about my client's case, and my client feels strongly

14  about its case, so I would like to give you some sense of why.

15         And I start by saying, as I did earlier, the question

16  for today is not could Kellogg Community College have some

17  other policy.  Certainly there are lots of policies.  We've

18  cited many cases for you which have very similar policies.

19  Some sort of differentiation between groups that are approved

20  and off-site people that have no approval.  Some

21  differentiation between things that are planned and that you

22  need to get permission for and other things.  Some appeal

23  process.  Some restriction on time, place, and manner.  We've

24  cited many of those cases.  So the question isn't could Kellogg

25  Community College draft its policy to write up different

1  factors.  The question is is the policy as it stands today

2  unlawful?  And I submit to you strongly that the answer is no.

3  First of all, as you well know, preliminary relief is

4  extraordinary relief.  The Sixth Circuit says no power the

5  exercise of which is more delicate, requires greater caution,

6  deliberation, is more dangerous in a doubtful case.  That's the

7  Detroit Newspaper Publishers case that we have cited.  And the

8  Sixth Circuit also says that while there's balancing factors,

9  no one factor is controlling and it's not a checklist of

10  factors.  The sine qua non --

11  *THE COURT:*  Let me just step aside from the factors.

12  I mean, those are pretty well-known and basic.  I can't

13  remember, do you have a son or daughter?

14  *MS. NORRIS:*  I have a daughter.

15  *THE COURT:*  Okay.  Say your daughter is at Kellogg

16  Community College and she and her friends start talking about

17  politics and discover they both like Rand Paul.

18  *MS. NORRIS:*  Uh-huh.

19  *THE COURT:*  And they say, "You know what, this is

20  important.  Our country has got all kinds of things going on.

21  We've got to go out there and tell our fellow students all

22  about Rand Paul and get them to go, you know, campaign for

23  libertarian ideals."

24  *MS. NORRIS:*  Uh-huh.

25  *THE COURT:*  Under your policy they can't do that

1    without seeking the prior permission of the administration.

2         MS. NORRIS:  I disagree depending on how you

3    characterize go talk.  And I think that our policy is here --

4         THE COURT:  Well, campaigning.  Campaigning, being on

5    the sidewalk saying, "Hey, you know, Margaret, let me tell you

6    about Rand Paul."  That's campaigning.

7         MS. NORRIS:  So I believe that the law holds that a

8    university or a college or a school, unlike a public park,

9    unlike --

10        THE COURT:  So are you telling me you think it's okay

11   for a university to say "That kind of spontaneous political

12   speech can't happen without our prior permission"?  You think

13   that's constitutional?

14        MS. NORRIS:  If what you're talking about is in the

15   open spaces --

16        THE COURT:  Yes.

17        MS. NORRIS:  -- yes.

18        THE COURT:  Okay.  So what case do you rely on for

19   that absolutely astonishing proposition in my view?

20        MS. NORRIS:  Well, I rely on several.  So, first of

21   all, the Bloedorn versus Grube case, the Georgia Southern

22   University case, it cites Widmar, which is the

23   U.S. Supreme Court case, and they specifically say that a

24   designated public forum is created only when a school opens

25   facilities for indiscriminate use by the general public.  A

1    limited public forum is when it's open for use by certain

2    groups or dedicated solely to discussion of certain subjects.

3    And these cases as well as the Southern case that we've cited

4    all specifically talk about the university's mission, the

5    importance of the university's mission.  In Widmar, the

6    Supreme Court case --

7              *THE COURT:*  So do you have -- I understand there are

8    cases that talk about what's a designated public forum, what's

9    a limited public forum.  But do you think you have any case

10   that says it's okay for a university to flat-out prohibit what

11   I've just described as that spontaneous student campaigning

12   without a prior permit?  We can go now on the diag at the

13   University of Michigan.  That's what the diag is all about at

14   the University of Michigan.  And I know your campus is smaller,

15   but it's not like it's so small that a handful of students

16   can't fit on the sidewalk and talk about common issues.

17             *MS. NORRIS:*  I think that a university can have time,

18   place, and manner restrictions for that speech.

19             *THE COURT:*  I'm not talking about time, place, and

20   manner.  I'm saying -- in my hypothetical those students can't

21   go out and start talking about the politics of Rand Paul, the

22   politics of Barack Obama, or Donald Trump, or anybody in a

23   campaign way or in a way to promote their views without your

24   prior permission.

25             *MS. NORRIS:*  I think the university could say if you

1    want to have that kind of speech, you can do it between

2    these hours and these hours and this section of the campus.

3               THE COURT:  All right.  Well, even that's not asking

4    for prior permission.  Now that's different.  You're saying,

5    fine, you can't have that speech after midnight.

6               MS. NORRIS:  Right.

7               THE COURT:  I'm not talking about that.  I'm saying

8    without prior permission they can't go out and do that until

9    they ask you for your permission.  That's what your policy

10   says, doesn't it?

11              MS. NORRIS:  Right.  But so do other cases that we've

12   cited.  Southern has a prior permission policy.

13              THE COURT:  For any speech that involves students

14   getting together spontaneously to promote some political ideal?

15              MS. NORRIS:  Well, you're using the words "get

16   together spontaneously."  If my daughter -- who happens to be

17   reasonably politically aware and active and went to a pretty

18   politically aware and active school -- if my daughter wants to

19   go to the floor below hers and talk to the women on that floor

20   about her political beliefs, they can kick her out if they

21   want, it's their dorm room.  She is certainly welcome to go do

22   that.  And they are certainly welcome to kick her out.  If she

23   wants to sit in the library with three students sitting around

24   chairs and they want to talk amongst themselves and they want

25   to say "You know, we think these other people might be

1    interested," so they go talk to them and those people say

2    "We're not interested," I think the university can prohibit

3    them from approaching people that say --

4         THE COURT:  Well, can they -- but the thing you're

5    not really answering, to me anyway, your policy, I think,

6    fairly read says they can't go out whether they are in the

7    library or on the sidewalk and make that pitch without prior

8    permission.

9         MS. NORRIS:  So "solicitation" is defined in our

10   policy.

11        THE COURT:  Right.  I mean, I have it highlighted.

12        MS. NORRIS:  Right.  "Solicitation" is defined.  So I

13   do think it includes approaching other people who may not want

14   to be approached.  I don't think it includes just the talking

15   that you discuss.

16        THE COURT:  So your answer is they can't do that

17   without your prior permission.

18        MS. NORRIS:  I think that's right.

19        THE COURT:  And I find that an astonishing

20   interpretation of the First Amendment.  And I'm still looking

21   for the case that says that.  There's a policy that says that

22   kind of spontaneous discussion can't happen without the prior

23   permission of the school.  I mean, that sounds like, you know,

24   1984 to me.

25        MS. NORRIS:  Well, the cases that I'm aware of have

1    not specifically said spontaneous discussion cannot happen, but

2    I have cited cases, including Southern, which say that you have

3    to have prior permission to solicit on a campus.

4           THE COURT:  All right.  But at least you're

5    comfortable defending the policy if it applies to spontaneous

6    discussion like that, spontaneous approach to say, "Hey, let me

7    tell you why I love Rand Paul and you should too"?

8           MS. NORRIS:  If it's done in the public areas that

9    the school says you need permission to solicit in, yes, I am.

10          THE COURT:  All right.

11          MS. NORRIS:  I think that the policy of the school is

12   clear about what kind of --

13          THE COURT:  Well, the policy of the school is clear,

14   but so is the policy of the Soviet Union in the days of the

15   Soviet Union.  It doesn't make it First Amendment-compliant.

16          MS. NORRIS:  I think that's where we get to the

17   mission of the school.  There are schools --

18          THE COURT:  Isn't that inherently content-generated?

19   I mean, that gets back to that.  If it's only okay to go out

20   and talk without prior permission if you're consistent with the

21   mission of the school, you could do that in Tiananmen Square

22   because the government is perfectly happy to have you speak if

23   they think you're speaking consistent with their mission, but

24   the real test, isn't it, is when you're speaking in a way that

25   might be contrary to what the school thinks is its mission.

1          *MS. NORRIS:*  Some of the cases we've cited,

2     Your Honor, specifically talk about you can go off the campus

3     to do that.  I think that if you're the University of Michigan,

4     we'll call that school A for a minute, and you're Kellogg

5     Community College, those are very different schools with very

6     different missions.  I think the University of Michigan would

7     say that part of its mission is a residential life that

8     includes lots of things, including perhaps exactly the kinds of

9     discussions you're talking about.  That's not Kellogg Community

10    College's mission.

11         *THE COURT:*  You don't think the campus is at least

12    for students a designated public forum?

13         *MS. NORRIS:*  No, I think it's a limited public forum.

14         *THE COURT:*  So the university, in your view, or the

15    community college, has the right to just -- as long as it's

16    content-neutral, we can debate that -- clamp down on anything

17    that happens, any speech by students or otherwise?

18         *MS. NORRIS:*  I think you can have reasonable time,

19    place, and manner restrictions.

20         *THE COURT:*  Well, no, that's different.  Reasonable

21    time -- nobody disputes that you can have reasonable time,

22    place, and manner.  Absolutely.  The question is whether once

23    you get to the stage of saying you can't speak or solicit in

24    the way I was describing without our prior permission, you

25    know, you've gone beyond that to essentially prior restraint.

1    And, anyway, I'm still looking for the case.  What I hear you

2    saying is there are cases that talk about solicitation

3    generally, nothing that you would say focuses specifically on

4    what I'm talking about as spontaneous speech.

5         *MS. NORRIS:*  I'm not aware of a case that

6    specifically talks about spontaneous speech one way or the

7    other, Your Honor.  That's correct.

8         There is one case I would like to bring to your

9    attention.

10        *THE COURT:*  All right.

11        *MS. NORRIS:*  It does not talk about spontaneous

12   speech specifically.  What it does do, though -- it's a

13   lower-court decision, it's not controlling on this Court -- but

14   what it does do is it talks about the several different circuit

15   positions that have been taken and the differences in those

16   circuits and comes to what it believes is a rational

17   conclusion.  And it's a brand-new case.  It's Keister,

18   K-E-I-S-T-E-R, versus Bell.  And it's 2017 Westlaw 878403.

19   It's a March 6th, 2017, case.  And in that case what

20   the court --

21        *THE COURT:*  What jurisdiction?  I'm sorry.

22        *MS. NORRIS:*  It's Northern District of Alabama.

23        *THE COURT:*  Thank you.

24        *MS. NORRIS:*  In that case the court discussed the

25   McGlone case, the Bloedorn case, and other circuit cases and

1   talked about the differences in them and noted that in many of

2   those cases the space that's at issue is tangential to city

3   streets.  It's perimeter, sidewalks, that kind of space.  And

4   agreed that that sort of space would be treated differently

5   from the internal campus space.

6            At Kellogg Community College, if you look at a map,

7   which has been -- it's an exhibit that both parties, I think,

8   have probably provided you -- the buildings are very close

9   together.  There's parking lot space around them and then

10  there's open space elsewhere.  The space that students want to

11  speak is the space where students are.  Makes sense.  Where

12  students are is in that closed, congested space.

13           *THE COURT:*  But as the policy reads it would also

14  apply in Parking Lot F along Roosevelt Avenue or the soccer

15  field or anywhere else.  Right?

16           *MS. NORRIS:*  Well, I think the soccer field and the

17  parking lot are a little bit different than Roosevelt Avenue.

18           *THE COURT:*  Yeah, but your policy doesn't make any

19  differentiation about that.  I mean, you still need prior

20  permission before you go to any of those locations, don't you?

21           *MS. NORRIS:*  I don't think that Roosevelt Avenue

22  would be considered just the college's space, so I don't know

23  that that would be subject --

24           *THE COURT:*  Well, your definition of campus.  Not

25  Roosevelt Avenue.  You were just talking about areas along it.

1    Parking Lot F is along it, right?

2         MS. NORRIS:  I think the school would be well-advised

3    to prohibit -- to prohibit speech in the middle of the parking

4    lot.  I think they have got good safety reasons.

5         THE COURT:  I'm just saying you can focus on the

6    individual buildings that are clustered, but the policy as

7    written applies universally to every corner of your campus.  I

8    mean, there's no place on campus where you can speak without

9    prior permission as a student.

10        MS. NORRIS:  Again, I quarrel with your use of the

11   word "speak."  This is a solicitation policy.

12        THE COURT:  Well, if you're speaking in a way that

13   promotes, campaigns ideas, political ideas, you're within

14   solicitation, aren't you?  I guess if you're speaking to say

15   "Show me where the bathroom is" that's not covered.  But if

16   you're out there saying "We like Rand Paul, you should too,"

17   "We like Barack Obama, you should too," talk to me about the

18   ACA, I mean, maybe that's not what you mean by campaign, which

19   is one of your subsets of speech or solicitation, but how do

20   you know unless you ask?  And that's the whole overbreadth

21   problem.

22        You know, we're -- the First Amendment is supposed to

23   be promoting the expression of ideas, not restricting and

24   chilling.  And I'm saying the breadth of the definition of

25   "solicit" certainly seems to cover all those kinds of

1    expressions and political ideas that are designed to draw

2    somebody else to your point of view.

3           *MS. NORRIS:*  That's assuming that that's what Kellogg

4    Community College wants to support.  What Kellogg Community

5    College is trying to do is educate students who are

6    primarily -- none of them are residential students.  The

7    students are often working, raising families.  They are not 18-

8    to 22-year-olds who are looking for a significant co-curricular

9    experience outside of the classroom.  Many schools that's as

10   much a part of what you pay for as the classroom.  That's not

11   Kellogg Community College's mission.  Its mission is its

12   community and its community is different from a large

13   university.

14          So it would be against the law, I agree, for Kellogg

15   Community College to say it matters whether you're campaigning

16   for Rand Paul or Bernie Sanders.  That would be against the

17   law.  It would be against the law to say you can't have

18   political speech but you can have fundraising for the March of

19   Dimes speech.  That would be against the law.  It doesn't do

20   any of those things.  It doesn't do any of those things.  What

21   it says is we're going to restrict when and where and how

22   people have something that's not the conversation with the

23   roommate, that's not the conversation over the lunch table --

24          *THE COURT:*  Let me ask you, is soliciting funds for

25   contributions to Kellogg Community itself consistent with the

1    mission?

2          *MS. NORRIS:*  You mean Kellogg Community College

3    raising money?

4          *THE COURT:*  Yeah.  Like if students want to go out

5    and say "We love Kellogg Community College, you should

6    contribute to it," that you would say is consistent with your

7    mission?

8          *MS. NORRIS:*  I think if students were fundraising on

9    the campus --

10          *THE COURT:*  Well, what if they are fundraising for

11   Kalamazoo Valley Community College?

12          *MS. NORRIS:*  I think if they were fundraising for

13   either one on the campus, they would be subject to the policy.

14          *THE COURT:*  Either one?

15          *MS. NORRIS:*  Yeah.  I don't think it matters if it's

16   for us or for somebody else.  I would agree that that would be

17   treated the same.

18          *THE COURT:*  All right.

19          *MS. NORRIS:*  Right.  I mean, I understand --

20          *THE COURT:*  What if you're fundraising for an

21   organization that's against community colleges or public

22   education?

23          *MS. NORRIS:*  I think if you're content-neutral,

24   you're content-neutral.

25          *THE COURT:*  And that's consistent with the mission of

1    the university?

2         *MS. NORRIS:*  I think their mission -- as some of the

3    cases we've cited say -- including the Widmar case -- the

4    purpose of a college isn't necessarily speech, whereas the

5    purpose of having a public area like a park may be speech.  The

6    purpose -- the primary purpose of Kellogg Community College is

7    to educate its students, and it gets to decide how it thinks

8    that's best done.  And if --

9         *THE COURT:*  So let me just read, "Soliciting

10   activities on campus are permitted only when the activities

11   support the mission of Kalamazoo" -- or I'm sorry -- "of

12   Kellogg Community College or the mission of a recognized

13   college entity or activity."  And I know it later says we're

14   not looking at the content.  But how do you understand that

15   sentence in a way that doesn't look at content?  I mean, how

16   can you support the mission of Kellogg Community College or not

17   apart from the content of the speech?

18        *MS. NORRIS:*  Well, the stated purpose of the policy I

19   indicated earlier.

20        *THE COURT:*  No, no, but how do you interpret that

21   sentence?  I mean, you told me earlier that that meant it

22   involved, you know, basically crowd control.

23        *MS. NORRIS:*  Right.  Which is what the policy says.

24        *THE COURT:*  But that sentence "Soliciting activities

25   are permitted only when the activities support the mission of

1    Kalamazoo Community College [sic]" and you're saying there's no

2    content at all involved in that?

3            MS. NORRIS:  Right.  So the stated purpose of the

4    policy -- I mean, I realize you don't think this is sufficient

5    and you're the judge, but the stated --

6            THE COURT:  So you could delete that sentence and

7    have the same policy because elsewhere you talk about crowd

8    control?

9            MS. NORRIS:  That's -- in settlement discussions we

10   discussed that, Your Honor.  But there were other things we

11   discussed in settlement discussions that were not acceptable to

12   us that have nothing to do with the content of the policy.

13           THE COURT:  All right.

14           MS. NORRIS:  The stated purpose of the policy is to

15   ensure an atmosphere conducive to learning, reasonable conduct

16   of business, unobstructed access to the college for its

17   students, faculty, employees, occupants, the public, and

18   maintenance of the grounds.  Those are legitimate purposes.

19   And they are stated.  They are not in someone's mind.  They are

20   not, you know, subject to the whim of somebody.  Those are the

21   stated purposes of the policy.

22           The mission, which is on our website, which we've

23   cited for you, talks about it's to educate people.  That's the

24   mission.  And how Kellogg Community College chooses to do that

25   is up to the college so long as it does not prohibit speech on

1    the basis of content.  And there's simply no evidence here that

2    it does.

3              *THE COURT:*  You know Mao Tse-tung said the same thing

4    in the cultural revolution, right?  I mean, isn't that the big

5    problem?  That, you know, we can talk in generic generalities

6    about promoting education and all of that.  I mean, that's what

7    the cultural revolution said too.  The problem is putting that

8    in the hands of government as opposed to the governed.  I mean,

9    that's what the First Amendment is all about.  And here the

10   governed, the students, only get to say things out loud,

11   campaign, if the government first says okay.

12             *MS. NORRIS:*  So if a student decided that they are

13   going to solicit for a credit card company and every student

14   that walked into the student center, you know, got greeted by

15   somebody who is trying to solicit for a credit card company,

16   it's your position that the college would have no ability to

17   stop that?

18             *THE COURT:*  I didn't say that.  I'm saying --

19             *MS. NORRIS:*  But I don't see the difference.

20             *THE COURT:*  Well, then you can make that argument.

21   And you can write a policy that addresses that concern instead

22   of saying all prior speech has to be approved and allowed by

23   us.  No speech until we approve it, you know, if it falls

24   within the definition of solicitation.  I mean, that's the

25   problem from my perspective.  You may have very legitimate

1    interests at all kinds of edges of both traffic control, crowd

2    control, safety, and maybe other things as well.  Commercial

3    advertising.  But the policy isn't written in that way.  It's

4    written to cover all solicitation.  And that includes core

5    First Amendment speech.  Political speech.  I mean, core.  And

6    I just find it astonishing that the government gets to say in

7    advance before students spontaneously get together and talk

8    about politics in a way that tries to persuade their fellow

9    students that the government gets to say yes or no first.  That

10   strikes me as incredible.

11        *MS. NORRIS:*  I suppose -- I obviously disagree with

12   your comparisons to China and the Soviet Union, but I suppose

13   it's certainly true that any policy, no matter how worded, the

14   proof of the pudding is in the implementation of the policy.

15   And --

16        *THE COURT:*  Generally.  But in First Amendment the

17   overbreadth analysis says we're so concerned about chilling

18   speech that when you have a policy that could tread on the

19   perimeter, you know, the policy falls.  That precision is so

20   important, you know.  So I think in First Amendment context

21   that's a qualified statement.

22        *MS. NORRIS:*  But the cases -- there are actually

23   cases, and we've cited them, which say -- there was one where a

24   preacher -- a number of these cases involve evangelists -- and

25   there was one where a preacher was concerned about the policy,

1   wasn't clear -- he thought it was overly broad, wasn't clear

2   whether he would be allowed to speak under that policy.  So he

3   wrote a letter and asked if he would be allowed to speak.  And

4   he got a letter back and the answer was, "Yes, this day, this

5   time, you can speak to your heart's content."  And so he then

6   made the overbreadth argument, and the court said, no, he had

7   no reason to believe it was overly broad.  These plaintiffs in

8   this case --

9        THE COURT:  Well, the preacher is not a student in

10   that case.

11        MS. NORRIS:  Well, interestingly, the one student who

12   was a student has not signed an affidavit regarding irreparable

13   harm, is not here, and was not at the mandatory settlement

14   conference.  So the student that has been --

15        THE COURT:  He was the one who left before the others

16   got arrested?

17        MS. NORRIS:  Correct.  But the others were not

18   students.

19        THE COURT:  Well, the one has been a student before

20   and after and was part of the group that was trying to get

21   student recognition.

22        MS. NORRIS:  To say that she was a student after is

23   to fast forward history.  At the time these decisions were

24   made, she was a former student of the community college.  She

25   had taken classes and now she was not taking classes and she

 1    was not a student.

 2            So I think that it does matter that these plaintiffs

 3    here tried the policy and were granted permission under the

 4    policy.  Michelle Gregoire applied for permission to speak, to

 5    solicit, was allowed to solicit, and simply didn't feel that it

 6    was effective enough.  And she wasn't banished to the

 7    hinterlands of the campus.  She wasn't banished to where there

 8    were no students.  She was allowed to solicit in the student

 9    center, the busiest, most desirable place to solicit.  She was

10    allowed to solicit there and it wasn't good enough.  So they

11    intentionally -- they weren't denied permission at any time.

12    And on the day in question they were told multiple times, you

13    know, "We're not -- we treat everybody else this way.  We're

14    not going to treat them differently.  You have to go sign up.

15    You sign up and you can stand out here and do this.  Here are

16    the places you can do it."  And they chose not to do that.

17            So I don't think this is an overbreadth issue.  I

18    don't think this is an interpretation-of-the-policy issue.

19    They knew exactly what the policy was.  They knew exactly how

20    the policy worked.  They had been granted permission under the

21    policy.  And they chose not to do that here.

22            My family is pretty politically active.  My father

23    was thrown in jail for civil disobedience.  One of the

24    ramifications of civil disobedience is exactly that.  If you

25    want to bring attention to your cause, there are ways to do

1  that that include breaking the law, but then you pay the
2  penalty.
3          THE COURT:  But the difference between most civil
4  disobedience cases is things like blocking a doorway, occupying
5  an office, versus standing on a sidewalk.
6          MS. NORRIS:  Well, he was arrested in Selma, Alabama,
7  for standing on a sidewalk.
8          THE COURT:  But here people were arrested for
9  standing on the sidewalk passing out Constitutions without
10  prior permission of the university.
11          MS. NORRIS:  Right.  They were arrested for
12  soliciting people without permission and they don't want to pay
13  the penalty for that.
14          My father did not sue the state of Alabama.  He was
15  well-informed about what he was doing.
16          THE COURT:  That's because the prosecutor dismissed
17  the charge, right?  Because the prosecutor wasn't going to
18  argue to a jury or a judge that passing out Constitutions
19  violates the criminal law.  I mean, isn't that really --
20          MS. NORRIS:  We can have a discussion about what
21  motivates a prosecutor at that time and that place.  I
22  disagree.  But it is our position that the college has the
23  ability to manage where the people are and manage how the
24  people interact with the people who are trying to take the
25  classes.  Not on a content-based.  Not on which side of the

```
 1    thing you're on.  Not on whether it's political or not

 2    political.  Not on any content-based, but simply on a how you

 3    approach our students who are trying to get their education.

 4    And I think they have the permission -- the authority to do

 5    that.  I have not seen any law that says that they can't do

 6    that.

 7              THE COURT:  Okay.  Nobody has talked about this

 8    aspect of the policy that I recall, but to me it underscores

 9    the breadth of what Kellogg Community College is trying to do

10    on speech.  And it's Part 4, the off-campus solicitation.  So

11    if you get to be a recognized college entity and you desire to

12    conduct solicitation off-campus, you first have to coordinate

13    with the government too.  Seriously?

14              MS. NORRIS:  If you're doing it under the auspices of

15    the campus, yes.

16              THE COURT:  So the price is if you want to become

17    recognized, you can't even take your group, you can't take

18    students or whatever this group is into the coffeehouse

19    downtown without first getting the permission of the

20    government.

21              MS. NORRIS:  I have not asked them any questions

22    about how that's been enforced.

23              THE COURT:  No, I'm not talking about how it's

24    enforced.  I'm talking about how it's written.  I mean, that's

25    how it's written, right?  You have to coordinate -- must
```

1    coordinate those activities with a student life office prior to

2    commencing the activities.

3              *MS. NORRIS:*  If you're acting as a student group

4    under the banner of the college.

5              *THE COURT:*  Well, under the banner of the student

6    group, right?

7              *MS. NORRIS:*  Yes, but it's a Kellogg Community

8    College student group.  It's not -- it's not --

9              *THE COURT:*  Doesn't that just strike you -- I mean,

10   do you really want this in the press?  Come to Kalamazoo -- or

11   to Kellogg Community College because you can't speak about

12   politics until we give you permission on or off campus?  That

13   just strikes me as an astonishing position for a college to

14   take.

15             *MS. NORRIS:*  I think the position is we want you to

16   come to Kellogg Community College because you can get done here

17   what you need to get done while you have jobs and other things

18   that people at large universities usually don't have to deal

19   with.  The students here -- there's a reason why there's not a

20   lot of success soliciting in the student hall, because that's

21   not where the students usually want to be.  They want to get

22   their work done and get home or get to their jobs.  And I think

23   the college is allowed to give them that environment.

24             And we can argue about whether that's a good mission

25   or a bad mission, but it's a mission that the college has

1    chosen, and I think they are allowed to do that.

2              *THE COURT:*  Okay.  Thank you.

3              Any rebuttal?

4              *MR. BARHAM:*  Briefly, Your Honor.  Your Honor

5    repeatedly asked for precedent allowing a university to impose

6    such a broad prior restraint on student speech, and opposing

7    counsel failed to cite one single case dealing with student

8    speech.  Bloedorn is an Eleventh Circuit case dealing with an

9    off-campus street preacher.  The Keister case that she cited

10   from the Northern District of Alabama, also a street preacher

11   case.  Neither of which dealt with students.

12             Here we are before this Court on a preliminary

13   injunction.  There is no question that one of -- that the

14   policy was applied to students in September of 2016 when

15   Mr. Withers was threatened with arrest.  There's no question

16   that Mrs. Gregoire is going to be a student -- was a student

17   this past spring, is going to be a student this fall, and will

18   be subject to the policy.

19             Your Honor also asked for precedent where a

20   university was allowed to say that you must support our mission

21   in order to speak on campus.  Sure, there's language in court

22   cases talking about a school's educational mission, but there

23   is no case -- and opposing counsel cited to none -- allowing a

24   university to say that students must support the mission of the

25   college or the university in order to speak on campus.

1           Opposing counsel indicated that -- disputed the

2    definition of spontaneous speech.  Well, in an era where news

3    is being driven by tweets, it is imperative that students be

4    allowed to speak spontaneously, otherwise their speech will

5    lose its effectiveness.  There's a case out of Colorado cited

6    in our brief that talks about how the timing of speech is a

7    fundamental First Amendment value.

8           Opposing counsel indicated that defendants are trying

9    to confine student speech to the area that they think is the

10   most desirable.  And that gets to one of the fundamental issues

11   in this case.  They have set the entire outdoor areas of campus

12   off-limits to student speech and have instead limited that to

13   information tables inside the student center.  Well, defendants

14   don't get to decide what is the most desirable spot for student

15   speech.  That is a matter that an individual student speaker

16   can make a value judgment as to what's in the best interests of

17   their group.  So if they want to speak in the open, generally

18   accessible areas of campus, the areas that are unquestionably

19   designated public forum, then unless they are violating a

20   policy that's narrowly tailored to a significant governmental

21   interest, they have the right to do so.

22          And that's the fundamental disconnect between the law

23   and defendant's mind-set of here are the places where you can

24   speak.  No.  In the designated -- in the public outdoor areas

25   of campus, the areas where our students want to speak, that's

1    where the law says they get to speak.  Roberts versus Haragan

2    says it's the irreducible public forum areas that must be open

3    to student speech.  The university can designate more, but they

4    can't designate less.

5            This case is so -- the -- opposing counsel questioned

6    Mr. Withers.  Mr. Withers has provided an affidavit.  That's

7    called a verified complaint.  And so he has provided testimony

8    here.  And there's no question that he was a student, that he

9    was trying to speak when he was threatened with arrest, which

10   is the classic First Amendment legal injury.

11           Opposing counsel -- Your Honor mentioned the

12   components of the policy that require KCC's permission in order

13   to solicit off-campus, and opposing counsel said, "Yes, if

14   you're operating under the auspices of KCC, that's what's

15   required."  Well, the only problem with that is the Rosenberger

16   case from the Supreme Court made it clear that student

17   organizations are not arms of the college or university with

18   which they are affiliated.  They are private entities.  And so

19   there's no way for the university to say, "Well, you're

20   speaking on our behalf and, therefore, we can control your

21   speech even off-campus."

22           The other examples that opposing counsel has provided

23   of restrictions that would be potentially problematic such as

24   students trying to speak in the library or in the dorm or in

25   the student hall, not applicable to this case because in this

1    case what we're trying to do is speak on the sidewalk.  Speak

2    in the outdoor areas of campus.  And, therefore, Your Honor, we

3    would request that this Court issue an injunction modeled after

4    the one issued by the Williams court invalidating the speech

5    permit and speech zone policies challenged here and prohibiting

6    KCC officials from imposing any restrictions that are not

7    narrowly tailored to a significant governmental interest on

8    student speech in the public outdoor areas of campus.

9        THE COURT:  What's your position in this case or

10   organizationally on commercial solicitations like the credit

11   card offer hypothetical Ms. Norris puts?

12       MR. BARHAM:  I believe, Your Honor, that there is

13   authority allowing a university to impose a different set of

14   requirements on commercial solicitation.  And in fact, most of

15   the universities that I have looked into, they have a separate

16   policy for commercial solicitation, or they define solicitation

17   only to apply to commercial sorts of transactions.  That's one

18   of the notable aspects of this policy is that it is so broad.

19   The definition of "solicitation" covers so much protected

20   speech that has no bearing whatsoever on commercial

21   transactions.

22       THE COURT:  And then the March case, the Keister

23   against Bell, do you know the case and do you have any position

24   on it one way or the other today?

25       MR. BARHAM:  I am not intimately familiar with the

1    case, Your Honor, but from what we were able to gather just

2    sitting at counsel table just now, it also involves an

3    off-campus street preacher and, therefore, is not determinative

4    of the kind of forum or the types of restrictions that are

5    permissible on student speech.  Instead the most directly

6    on-point case is that Williams case dealing with, you know,

7    another chapter of Young Americans for Liberty that was facing

8    similar, if not identical, policy restrictions and where they

9    were subject to the same threats of arrest that were actually

10   carried out against our students.

11             *THE COURT:*  Okay.  Thank you.

12             *MR. BARHAM:*  Thank you, Your Honor.

13             *THE COURT:*  Ms. Norris, I'll give you five minutes to

14   be uninterrupted and give me your best hold.  Okay?

15             *MS. NORRIS:*  I won't take that long, Your Honor.

16   Just a few things.  I'll start with where you just finished.

17   There is nothing that would say that a student -- if

18   plaintiffs' position is to be granted, there's nothing to say

19   that commercial speech could be treated differently.  If it's

20   an active student, an active student wants to solicit for a

21   credit card company, you know, to make some money on the side

22   or whatever it is, there's nothing that would prohibit them

23   from doing that.  And even plaintiffs acknowledge that kind of

24   speech might not be as valuable as the kind of speech they are

25   talking about.  Well, the minute you start talking about what

1    speech is valuable or not valuable, we're on the slippery slope

2    that you decry.

3            Kellogg Community College is not having at the core

4    of its mission speech in public places.  Any kind of speech in

5    public places.  And it does not need to open itself up to that

6    if it chooses not to do so.

7            The Southworth case, you can certainly read it, you

8    probably have, but it specifically talks about the dangers of

9    misinterpretation, or, you know, if you're not sure how a

10   policy is going to be implemented, those sorts of things.  And

11   it talks about exact kinds of safeguards that the Kellogg

12   policy has.  Appeals process, those sorts of things.  So that

13   if there is abuse in the kind of, you know, Soviet or Chinese

14   way that you have suggested, that there are remedies for that

15   abuse baked into the policy.

16           And finally, time, place, and manner restrictions do

17   matter.  It's plaintiffs' position that defendant doesn't get

18   to decide where speech can occur.  And we've cited a great deal

19   of law on that issue.  I'd urge you to look specifically at the

20   university cases that we've cited because they do talk about a

21   different kind of public forum than the sorts of forums that

22   have been talked about in a number of the other cases cited by

23   plaintiffs.  Unless you have other questions, that's all I

24   have.

25           *THE COURT:*  Okay.  No.  Thank you.

1          *MR. BARHAM:*  Your Honor, may I respond briefly?

2          *THE COURT:*  All right.

3          *MR. BARHAM:*  The Southworth case does not control

4     here in the sense that that was dealing with a student

5     fee-funding forum, it was a limited public forum, and,

6     therefore, is different than the designated public forums of

7     the outdoor areas of campus.  And the appeals process there was

8     set forward with specific tight deadlines.  Here there is no

9     deadline.  In fact, that's another of the problems with this

10    prior restraint.  There is no deadline on any decisions.  The

11    decisions must be made "as promptly as possible," to quote the

12    policy.  Well, as promptly as possible is not the brief

13    specified time restriction that Freedman and the other prior

14    restraint cases require.  And there's a reason that KCC

15    professors do not require students to submit work as promptly

16    as possible but instead impose an actual specified deadline.

17    So unless Your Honor has further questions, thank you.

18          *THE COURT:*  All right.  Thank you both.  We'll take

19    it under advisement and issue a written opinion.

20          *THE CLERK:*  All rise, please.  Court is adjourned.

21        *(Proceeding concluded at 4:33 p.m.)*

22                      *   *   *   *   *

23        I certify that the foregoing is a correct transcript

24    from the record of proceedings in the above-entitled matter.

25          I further certify that the transcript fees and format

1    comply with those prescribed by the court and the Judicial

2    Conference of the United States.

3

4    Date:  August 9, 2017

5

6                              **/s/ Glenda Trexler**

7                              Glenda Trexler, CSR-1436, RPR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25